# EXHIBIT 1

1

2

3

4

5

6

7

8

9

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

10   LEFT COAST VENTURES, INC., a

11   Delaware corporation,                    No.

12                    Plaintiff,               SUMMONS
                                               (60 day)
13          v.

14   BRIGHTSTAR, LLC, a limited liability
     company organized under the laws of
15   Colorado,

16                    Defendant.

17

18   TO:    BRIGHTSTAR, LLC

19

20          A lawsuit has been started against you in the above-entitled court by Left Coast

21   Ventures, Inc., the Plaintiff. Plaintiff's claim is stated in the written complaint, a copy of

22   which is served upon you with this summons.

23          In order to defend against this lawsuit, you must respond to the complaint by stating

24   your defense in writing, and by serving a copy upon the person signing this summons

25   within 60 days after service of this summons, excluding the day of service, or a default

26   judgment may be entered against you without notice. A default judgment is one where

SUMMONS
Page 1



1  plaintiff is entitled to what has been asked for because you have not responded. If you

2  serve a notice of appearance on the undersigned person, you are entitled to notice before a

3  default judgment may be entered.

4     You may demand that the plaintiff file this lawsuit with the court. If you do so, the

5  demand must be in writing and must be served upon the person signing this summons.

6  Within 14 days after you served the demand the plaintiff must file this lawsuit with the

7  court, or the service on you of this summons and complaint will be void.

8     If you wish to seek the advice of any attorney in this matter, you should do so

9  promptly so that your written response, if any may be served on time.

10     THIS SUMMONS is issued pursuant to Rule 4 of the Superior Court Civil Rules of

11  the State of Washington.

12

13  DATED: April 5, 2019.

                             **ARETE LAW GROUP PLLC**

14                               By: */s/ Jeremy E. Roller*

15                               Jeremy E. Roller, WSBA No. 32021
                             1218 Third Avenue, Suite 2100

16                               Seattle, WA 98101
                             Phone: (206) 428-3250

17                               Fax: (206) 428-3251
                             jroller@aretelaw.com

18                             *Attorneys for Left Coast Ventures, Inc.*

19

20

21

22

23

24

25

26



1
2
3
4
5
6
7
8
9

### SUPERIOR COURT OF THE STATE OF WASHINGTON
### FOR KING COUNTY

10

LEFT COAST VENTURES, INC., a
Delaware corporation,

11

No.

12

Plaintiff,

COMPLAINT

13

v.

14

BRIGHTSTAR, LLC, a limited liability
company organized under the laws of
Colorado,

15

16

Defendant.

17

18          Plaintiff Left Coast Ventures, Inc. ("Left Coast"), by and through its undersigned

19   counsel, alleges the following against Defendant Brightstar, LLC ("Brightstar").

20                                        **INTRODUCTION**

21          1.      This action arises from Brightstar's breach of an agreement to sell its interest

22   in Native Roots, a Colorado-based cannabis retail chain that is one of the largest in the

23   United States.  In short, Peter Knobel, Brightstar's principal, attempted a shotgun buyout of

24   his Native Roots partners, was outmaneuvered by one of those partners, entered a contract

25   to sell Native Roots to Privateer Holdings to salvage a profit, then reneged on that

26   obligation when he developed seller's remorse.

COMPLAINT
Page 1


Arête LAW GROUP   1218 THIRD AVENUE
SUITE 2300
SEATTLE WA 98101
(206) 428-3250

2.      Despite (1) that the agreement is binding, (2) Privateer Holdings' initiation of due diligence, and (3) countless assurances and representations that Brightstar intended to perform under the agreement, Brightstar, without cause, breached that contract by refusing to sell Native Roots under the contract, instead intending to shop Native Roots to third parties.

3.      Brightstar's wrongful conduct has caused substantial harm to Left Coast. By this action Left Coast, which is an explicitly permitted assignee of Privateer Holdings' rights and obligations under the contract, seeks a judgment directing Brightstar to specifically perform under the agreement and for damages arising from Brightstar's breach of contract.

## PARTIES

4.      Left Coast is a Delaware corporation with its principal place of business in Santa Rosa, California. Left Coast is a holding company focused on acquiring, investing in, and operating companies involved in the legal cannabis market in the United States.

5.      Brightstar is a limited liability company organized under the laws of Colorado. Brightstar's sole member is Peter Knobel, a real estate developer and cannabis financier.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under RCW 2.08.010.

7.      This Court has personal jurisdiction over Brightstar because this action arises from the transaction of business in Washington State under RCW 4.28.185(1)(a) and because Brightstar consented to jurisdiction of courts located in King County, Washington, in the contract from which this lawsuit arises.

8.      Venue in King County, Washington, is appropriate under RCW 4.12.025(3)(c) because the contract from which this lawsuit arises was made in King

COMPLAINT
Page 2

Arête
LAW GROUP
1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

1  County and because in that contract Brightstar consented to venue in King County,
2  Washington.

### STATEMENT OF FACTS

4      9.    Native Roots is a chain of medical and recreational marijuana dispensaries in
5  Colorado. The Native Roots dispensaries, related assets, subsidiaries, and affiliates are
6  owned by three limited liability companies organized under the laws of Colorado: (1) NR
7  Parentco, LLC, (2) The Dandelion, LLC, and (3) Boulder RX, LLC (NR Parentco, The
8  Dandelion, and Boulder RX are collectively referred to as the "Native Roots Entities").

9      10.    By March of 2017, each of the Native Roots Entities was governed by one of
10  three substantially similar operating agreements: (1) the Fifth Amended and Restated
11  Limited Liability Company Operating Agreement of NR Parentco, LLC, (2) the Fourth
12  Amended and Restated Limited Liability Company Operating Agreement of The
13  Dandelion, LLC, and (3) the Sixth Amended and Restated Limited Liability Operating
14  Agreement of Boulder RX, LLC (collectively, the "Native Roots Entities' Operating
15  Agreements").

16      11.    Each of the Native Roots Entities' Operating Agreements contained a buyout
17  provision (the "Shotgun Clause") by which a member could offer to buy another member's
18  interests in the companies at a set price. The member receiving the offer would then be
19  bound to either sell its entire membership interest at the offering price or buy the entire
20  membership interest of the offering party at the offering price, as adjusted for the
21  percentage difference in the offering member's membership interest and the receiving
22  member's membership interest. The receiving party would have 45 days after receiving the
23  offer to decide whether to buy or sell.

24      12.    On July 12, 2017, Brightstar, which is owned entirely by Peter Knobel and
25  holds interests in the Native Roots Entities as well as real estate occupied by the Native
26  Roots Entities, issued an offer to buy all of Josh Ginsberg's interests in the Native Roots

COMPLAINT
Page 3


Arête
LAW GROUP
1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

1  Entities for $2,000,000 plus accrued but unpaid personal income tax arising from

2  Ginsberg's membership in those entities for 2016 to closing.

3          13.     Lacking the financial means to buy out Brightstar's interests in the Native

4  Roots Entities (which were far larger than Ginsberg's interests in those entities), in mid-

5  July 2017 Ginsberg reached out to Christian Groh, a partner at Privateer Holdings, Inc.

6  Privateer Holdings is one of the nation's leading cannabis-focused private equity firms.

7  Ginsberg contacted Groh to determine whether Privateer Holdings might be interested in

8  assisting Ginsberg with purchasing Brightstar's interests in the Native Roots Entities.

9          14.     On July 28, 2017, Brendan Kennedy (Executive Chairman of Privateer

10  Holdings), Groh, and Brett Cummings (who would later become Chief Executive Officer of

11  Left Coast) met in Denver, Colorado, with Ginsberg, Ginsberg's wife, and at least one other

12  member and/or executive of the Native Roots Entities regarding Brightstar's shotgun offer

13  to Ginsberg. In that meeting, Ginsberg again expressed his interest in "calling" the shotgun

14  offer and buying out Brightstar's interests in the Native Roots Entities.

15          15.     Ginsberg and Privateer Holdings held multiple conversations over the

16  following weeks regarding the possibility of Privateer Holdings assisting Ginsberg in

17  buying out Brightstar's interests in the Native Roots Entities. No deal was ever finalized

18  between Ginsberg and Privateer Holdings regarding Privateer Holdings assisting Ginsberg

19  in buying out Brightstar's interests in the Native Roots Entities.

20          16.     On or about August 11, 2017, Kennedy reached out to Knobel and arranged

21  a meeting at the Solaris Resort (owned by Knobel) in Vail, Colorado. Kennedy wished to

22  explore whether issues relating to Knobel's real estate holdings, which were essential to the

23  Native Roots Entities, would be problematic if Privateer Holdings were to assist Ginsberg

24  in buying out Brightstar's interests in those entities. In that meeting Knobel said that his

25  goal in issuing the shotgun offer to Ginsberg was to buy out the Native Roots Entities' other

26  owners and then sell the business.

Arête
LAW GROUP

1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

17.    Over the next several weeks, Kennedy and Knobel had several telephone calls. Knobel again indicated that that he wished to complete the shotgun buyout, then sell the entire Native Roots business. On or about August 24, 2017, Knobel told Kennedy that Privateer Holdings could buy the entire Native Roots business for a particular sum after the shotgun offer closed. Knobel mentioned that Ginsberg had been contacted by another cannabis company regarding potential acquisition of the Native Roots Entities. In reference to his admittedly lowball shotgun offer, Knobel said that "to give these boneheads [referring to Ginsberg and another Native Roots Entities member, Rhett Jordan] money is crazy" and that "Josh [Ginsberg], in the business world, is a fool." Knobel also expressed concern that if Ginsberg was able to meet the terms of the shotgun offer, Knobel would have been outmaneuvered, resulting in significantly reduced financial gain.

18.    On August 25, 2017, Brightstar and Privateer Holdings entered a binding letter of intent (the "Contract") regarding Privateer Holdings' acquisition of "all the membership interests of NR Parentco, LLC, The Dandelion, LLC, Boulder RX, LLC, and all of their respective subsidiaries and affiliates . . . (collectively, the 'Companies')." A true and correct copy of the Contract is attached hereto as **Exhibit A**.

19.    The Contract is a binding commitment by Brightstar to sell the Native Roots Entities to Privateer Holdings (or an entity affiliated with or designated by Privateer Holdings), subject to Privateer Holdings' completion of its due diligence investigation:

> This LOI represent[s] a binding commitment by Member [Brightstar] to undertake the obligations set forth herein, including without limitation the obligation to sell and transfer to Buyer (i) the membership interests of the Companies, and (ii) the real property, leases, and debt under the First Amended and Restated Loan Agreement dated April 18, 2016 (the "Loan Agreement"), all subject to Buyer's completion of its due diligence investigation of the Companies and the Member's and Ginsberg's membership interests in the Companies, as well as any other entities and subject matters, to its satisfaction.

Contract at 1. Although the Contract contained contingencies, those contingencies favored Privateer Holdings and did not alter Brightstar's unconditional obligation to sell and

Arête
LAW GROUP
1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

1   transfer to Privateer Holdings (or its designee) all of the membership interests of the Native

2   Roots Entities.  Put differently, the Contract provided Privateer Holdings an option to

3   purchase the membership interests of the Native Roots Entities, subject to Privateer

4   Holdings' due diligence investigation, etc.

5       20.     On information and belief, sometime in 2017 after execution of the Contract,

6   Ginsberg initiated an arbitration proceeding in which he asserted claims against Brightstar

7   and the Native Roots Entities.  The sale of the membership interests of the Native Roots

8   Entities to Privateer Holdings (or its designee) failed to occur during the pendency of that

9   arbitration.

10      21.     Over the course of several months following execution of the Contract,

11  Knobel reached out to Kennedy approximately ten times.  In those conversations, Knobel

12  updated Kennedy on the status of the arbitration.  Kennedy repeatedly reiterated Privateer

13  Holdings' intent to close the deal; each time Knobel agreed.  At no time did either Kennedy

14  or Knobel suggest that the Contract had expired or was not valid.

15      22.     On August 15, 2018, Kennedy met with Knobel and Jonathan Boord

16  (general counsel for the Native Roots Entities and Solaris) in Toronto.  At that meeting,

17  Knobel provided an update on the arbitration, which he said he believed he would win.

18  Knobel reaffirmed his desire to sell the Native Roots business.  Kennedy told Knobel that

19  Privateer Holdings intended to complete the deal.  Knobel responded that Brightstar also

20  intended to complete the deal.  Kennedy and Knobel also discussed a potential deal

21  regarding Knobel's nascent cannabis enterprise in Canada.

22      23.     On or about September 27, 2018, Boord informed Kennedy that the

23  arbitration had settled.  In the arbitration settlement agreement, Knobel, Ginsberg, and

24  Jordan agreed to engage an investment banker and to pursue a sale of the Native Roots

25  business.  On information and belief, Knobel never disclosed the existence of the Contract

26  to Ginsberg and Jordan.

COMPLAINT
Page 6

Arête
LAW GROUP

1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
[206] 428-3250

24.     On October 27, 2018, NR Parentco and Privateer Holdings entered a nondisclosure agreement.

25.     On October 29, 2018, representatives of Privateer Holdings, including Groh, Cummings, and Patrick Moen (Privateer Holdings' general counsel), met in Denver, Colorado, with Boord and Native Roots CEO Ryan Brown to discuss the possibility of amending the Contract. Moen unambiguously informed Brown and Boord that Privateer Holdings reserved its rights under the Contract, but that Privateer Holdings would discuss the possibility of amending the Contract or entering a superseding agreement in the interest of moving forward.

26.     After the October 29, 2018 meeting, representatives of Privateer Holdings and Native Roots continued to discuss potential terms of a superseding contract. In an effort to resolve the matter, and based in part on representations made by Brown and Boord that certain terms would be acceptable to Knobel, Ginsberg, and Jordan, Privateer Holdings substantially increased the proposed purchase price, while still explicitly reserving its rights under the Contract. In connection with the proposed superseding agreement circulated on December 11, 2018, Privateer Holdings issued a letter to Knobel that stated:

> Notwithstanding any provision in the [draft potential superseding] LOI (or any other proposal related to the Acquisition) to the contrary, PHI [Privateer Holdings] reserves all rights under the Letter of Intent executed by Peter Knobel (as the member of Brightstar LLC) and Brendan Kennedy (as the CEO of PHI) on August 25, 2017, . . . and PHI does not waive any rights thereunder unless and until such time as the parties have fully executed and delivered definitive agreements in connection with the Acquisition.

27.     On January 31, 2019, Privateer Holdings assigned its rights under the Contract to Left Coast.

28.     On February 12, 2019, Moen requested that Knobel's/Brightstar's counsel waive the confidentiality provision of the Contract so that Ginsberg could be informed of the Contract. Knobel's/Brightstar's counsel told Moen that his client was unwilling to

Arête LAW GROUP   1218 THIRD AVENUE SUITE 2100 SEATTLE WA 98101 [206] 428-3250

1    waive that provision, implicitly confirming that Knobel never disclosed the existence of the
2    contract to Ginsberg and Jordan.

3         29.    On February 21, 2019, Knobel's/Brightstar's counsel informed Moen that
4    Native Roots had engaged an investment banker, would not execute a term sheet that could
5    have superseded the Contract, and that the Native Roots business was being shopped for
6    sale to a third party.

7         30.    On information and belief, Knobel agreed to settle the arbitration as a pretext
8    to avoid Brightstar's obligations under the Contract because he believed he could secure a
9    higher price from a third party.

10                              **FIRST CLAIM**

11                           **Declaratory Judgment**

12        31.    Left Coast re-alleges and incorporates by this reference all allegations in the
13   preceding paragraphs.

14        32.    Under the Washington Uniform Declaratory Judgments Act, this Court has
15   the "power to declare rights, status and other legal relations whether or not further relief is
16   or could be claimed." RCW 7.24.010.  That Act further specifically provides that "[a]
17   contract may be construed either before or after there has been a breach thereof." RCW
18   7.24.030.

19        33.    There is an actual controversy between Left Coast and Brightstar regarding
20   Brightstar's obligation under the Contract to sell the Native Roots Entities to Left Coast.

21        34.    Left Coast is entitled to a declaratory judgment that Brightstar is obliged
22   under the Contract to sell the Native Roots Entities to Left Coast.

23                             **SECOND CLAIM**

24                           **Breach of Contract**

25        35.    Left Coast re-alleges and incorporates by this reference all allegations in the
26   preceding paragraphs.

COMPLAINT
Page 8

Arête LAW GROUP   1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

1      36.    The Contract is a valid contract between Left Coast (as assignee of Privateer
2   Holdings), on one hand, and Brightstar, on the other.

3      37.    The Contract imposed a duty on Brightstar to sell the Native Roots Entities
4   to Left Coast.

5      38.    Brightstar breached its duty to sell the Native Roots Entities to Left Coast.

6      39.    Left Coast suffered damage as a proximate result of Brightstar's failure to
7   sell the Native Roots Entities to Left Coast. Left Coast is entitled to the remedy of specific
8   performance because an award of money damages would be inadequate to compensate Left
9   Coast for Brightstar's breach.

10                          **PRAYER FOR RELIEF**

11      WHEREFORE, Left Coast prays for the following:

12      A.    For declaratory judgment in its favor and against Brightstar that Brightstar is
13   obliged to sell the Native Roots Entities to Left Coast;

14      B.    For judgment in its favor and against Brightstar on Left Coast's breach of
15   contract claim;

16      C.    For a judgment requiring Brightstar to specifically perform under the
17   Contract by selling the Native Roots Entities to Left Coast;

18      D.    For a money judgment (including pre-judgment interest and post-judgment
19   interest at the maximum rate allowed by law) in an amount to be determined at trial;

20      E.    For an award of attorneys' fees, costs, and expenses incurred in connection
21   with this lawsuit; and

22      F.    For such other and further relief as this Court deems just and proper.

23

24

25

26

COMPLAINT
Page 9

Arête
LAW GROUP
1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

1 | DATED: April 5, 2019.

**ARETE LAW GROUP PLLC**

By: */s/ Jeremy E. Roller*
Jeremy E. Roller, WSBA No. 32021
1218 Third Avenue, Suite 2100
Seattle, WA 98101
Phone: (206) 428-3250
Fax: (206) 428-3251
jroller@aretelaw.com

*Attorneys for Left Coast Ventures, Inc.*

COMPLAINT
Page 10



1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

# EXHIBIT A



STRICTLY CONFIDENTIAL

August 25, 2017

Peter Knobel
Peter.knobel@me.com
peter@solarisvail.com

Re: Privateer Holdings / Native Roots Letter of Intent

Dear Peter:

This Letter of Intent ("LOI") confirms the agreement of Privateer Holdings, Inc., a
Delaware corporation ("PHI") (or an entity affiliated with or designated by PHI) (referred to as
"Buyer"), on the one hand, and Brightstar LLC (the "Member"), a Colorado limited liability
company, on the other hand, regarding the conduct of discussions relating to the possible
acquisition (the "Proposed Acquisition") by Buyer of all of the membership interests of NR
Parentco, LLC, The Dandelion, LLC, Boulder RX, LLC, and all of their respective subsidiaries and
affiliates including but not limited to those set forth on Schedule I attached hereto (collectively, the
"Companies") held by or controlled by Member (including without limitation the membership
interests currently owned by Joshua Ginsberg).  Attached as Exhibit A to this LOI (and
incorporated herein) is a summary of proposed terms.

This LOI represent a binding commitment by Member to undertake the obligations set
forth herein, including without limitation the obligation to sell and transfer to Buyer (i) the
membership interests of the Companies, and (ii) the real property, leases, and debt under the First
Amended and Restated Loan Agreement dated April 18, 2016 (the "Loan Agreement"), all subject to
Buyer's completion of its due diligence investigation of the Companies and the Member's and
Ginsberg's membership interests in the Companies, as well as any other entities and subject
matters, to its satisfaction.  Other than as specifically set forth herein, however, each party agrees
that no contract, agreement, obligation, commitment or liability with respect to the Proposed
Acquisition or any other transaction shall exist or be deemed to exist by virtue of this LOI, any
other written or oral expression with respect to the Proposed Acquisition or otherwise, unless and
until; the parties have completed negotiations and obtained corporate approvals and have
executed and delivered a definitive acquisition agreement.  For the purposes of this LOI, the term

"definitive acquisition agreement" shall not include any written or oral acceptance of any offer or bid, any term sheet or any letter of intent or other written expression of Buyer's or the Member's intentions to negotiate or enter into a definitive acquisition agreement.

. Exclusivity. Until 5:00 p.m. Pacific Time on December 31, 2017 (the "Termination Date"), neither the Buyer nor the Member shall  (and each shall not permit its affiliates, financial advisors, attorneys, accountants or other representatives to), directly or indirectly, (a) accept any existing proposal or offer outstanding as of the date of this LOI or received on or after the date of this LOI from any other party to consummate a Competing Transaction; or (b) solicit, initiate, approve, facilitate or encourage, engage in discussions or negotiations with, or furnish information to, any person other than Buyer with respect to a Competing Transaction.  A Competing Transaction means, other than the Proposed Acquisition, (i) any transfer or sale of the Member's membership interests in the Companies (or rights to acquire Ginsberg's interests), (ii) any merger, consolidation, share exchange, recapitalization, or establishment of or investment in another legal entity or other similar transaction involving any of the Companies, (iii) any sale, lease, exchange, mortgage, pledge, transfer or other disposition of a material portion of the assets of the Member or the Companies, or (iv) any issuance, sale or transfer of equity interests or debt (or rights to acquire equity interests or debt) of the Companies (including for capital raising purposes) (in each case, a "Competing Transaction").  Member's pursuit and completion of the Shotgun Offer to Ginsberg dated July 12, 2017, shall not be considered a Competing Transaction. The Member shall cause any pending discussions or negotiations with any other person regarding a Competing Transaction to be immediately terminated and, until the Termination Date, will deal exclusively with Buyer with respect to discussing or negotiating any Competing Transaction.  The Member shall notify Buyer immediately if any inquiry or proposal regarding a Competing Transaction is made, including in such notice the identity of the person making the inquiry or proposal, the terms thereof and, if in written form, copies thereof.

2.  Due Diligence.  The Member shall permit Buyer to conduct a comprehensive due diligence investigation of its membership interest in the Companies and the business of the Companies to the reasonable satisfaction of Buyer, including without limitation, intellectual property (including access to processes and methodologies and all source code), licenses and permits, real estate holdings, financial, accounting, legal and employee matters of the Companies (including, without limitation, credit and background checks on the Key Employees).  The Member shall promptly reply to Buyer's due diligence requests and will provide Buyer with reasonable access to information and employees at mutually agreed upon times.

3. Conduct of Business. During the Exclusivity Period, the Member shall use its best efforts to ensure that the Companies shall (i) conduct their business in the ordinary course and not enter into any transaction or agreement and not take any action other than in the ordinary course and in a reasonable and prudent manner, consistent with past practices, (ii) use commercially reasonable efforts to preserve their existing relationships with their employees, customers, suppliers and the like, (iii) use commercially reasonable efforts to preserve and protect their properties and assets, (iv) not enter into any extraordinary transactions, and (v) not change the terms (including acceleration of vesting) of any outstanding stock option or other security or enter into or change the terms of any employment agreement.

5. Expenses. Buyer and the Member shall each pay its own costs and expenses in connection with the execution of this LOI and the transactions contemplated herein, including without limitation, fees of attorneys and other advisors.

6. Confidentiality. The parties agree that the existence and contents of this LOI and any definitive acquisition agreement, including without limitation the fact that discussions or negotiations are taking place, and any of the terms, conditions or facts (including status), with respect to the Proposed Acquisition, shall not be disclosed to third parties (including without limitation, Ginsberg or other members of Companies, unless mutually agreed by the parties; and not including professional advisors with a need to know) and shall be considered "Confidential Information" under the Mutual Nondisclosure Agreement, executed concurrently with this LOI, between PHI and the Member.

7. General Provisions. This LOI shall be governed by the internal laws of the State of Washington, without reference to its choice of law rules. Exclusive jurisdiction over and venue of any suit arising out of or relating to this letter agreement shall be in the state and federal courts located in King County, Washington. This LOI may be executed in counterpart copies. No modification of this LOI or waiver of the terms and conditions hereof shall be binding on the parties unless approved in writing by such party.

If you are in agreement with the foregoing, please so indicate by signing this LOI and returning it to us no later than 6:00 p.m., PST, on August 25, 2017.

Very truly yours,

**Privateer Holdings, Inc.**

By:

    Name: Brendan Kennedy
    Title: Chief Executive Officer

Accepted and agreed to as of August 25, 2017:

Brightstar LLC

By:

    Name: Peter Knobel
    Title: ___ member

## Exhibit A

**Summary of Terms Regarding (i) Proposed Acquisition of Certain Membership Interests of of NR Parentco, LLC, The Dandelion, LLC, and Boulder RX, LLC (and other affiliates and subsidiaries) and (ii) Loan Repayment, in each case by Privateer Holdings, Inc. or its Affiliate**

*This document outlines certain preliminary terms regarding the proposed purchase by Buyer (as defined below) of all of the Membership Interests held by Brightstar LLC ("Member") and Josh Ginsberg of the Companies (as defined below). The obligations of the parties with respect to the proposed transaction are not intended to be legally binding unless and until a definitive agreement with respect to the proposed transaction is executed, and this document creates no obligation for either party to negotiate with respect to such transaction or to enter into such definitive agreement.*

| | | |
|---|---|---|
| 1. | Acquiror: | PHI may effect the transaction through one of its direct or indirect subsidiaries or affiliates or another entity designated by PHI (the ultimate party to the transaction shall be referred to as the "Buyer"). |
| 2. | Target: | NR Parentco, LLC; The Dandelion, LLC; Boulder RX, LLC; and all of their respective subsidiaries and affiliates (collectively, the "Companies" and individually, a "Company"). Such subsidiaries and affiliates include without limitation the entities set forth on Schedule I. Member owns approximately 67% of each Company and Ginsberg owns approximately 15% of each Company. |
| 3. | Conditions Precedent: | The closing of the Proposed Acquisition shall occur on a date to be mutually agreed subsequent to the following conditions being satisfied (the "Closing"): |

A.   Member has acquired the membership interests of Ginsberg pursuant to the Shotgun Offer;

B.   The Companies shall have conducted their business in the ordinary course prior to Closing;

C.   Member has funded the real property acquisition at Glenwood Springs, and the amount added to the outstanding principal under the Loan Agreement;

D.   All necessary consents and approvals shall be in place, including without limitation, approvals from all necessary members of the Companies; and

E.   All Necessary Regulatory Approvals shall be in place, including without limitation, approvals from the Colorado Marijuana Enforcement Division and all applicable local jurisdictions.

4.   Structure:      The transaction would be structured as a membership interest purchase or similar
                     transaction as determined by Buyer pursuant to which the Member would receive
                     cash in exchange for its membership interests of the Companies.

5.   Purchase Price:  The Purchase Price in consideration for all of the outstanding equity (including
                      vested and unvested options and warrants) of the Companies held by the Member
                      (including all equity obtained in the Shotgun Offer) would be $22,000,000, payable
                      in cash as follows: (a) $15,000,000 upon mutual execution of the definitive
                      acquisition agreement; and (b) $7,000,000 at Closing, provided that: (y) in the
                      event Member acquires Ginsberg's membership interest in exchange for any
                      amount less than $2,000,000, the Purchase Price shall be reduced by an
                      equivalent amount, and (z) the $15,000,000 shall be secured by a first lien on all
                      Real Properties as defined in the Loan Agreement, and if the Proposed Acquisition
                      does not close, shall be returned to Buyer in full within five (5) days of such failure
                      to close.

6.   Debt Purchase:   At Closing, Buyer (or its designee) will have the right to purchase all of Member's
                      right, title and interest in and to the Loan Agreement for the then-current
                      outstanding balance of the loan at the time of Closing. Member shall finance such
                      Debt Purchase according to the following terms:
                          i.    simple interest charged at LIBOR + 625 basis points;
                          ii.   24-month repayment term, with 12-month extension at Buyer's
                                discretion;
                          iii.  The Debt Purchase finance by Member shall be amortized over the
                                life of the repayment term and any extension as set forth in
                                subsection ii above, and no early payment penalties.

                      For clarity, upon Buyer's closing of the Debt Purchase, all real estate owned or
                      controlled by the Companies (including all Real Properties as defined in the Loan
                      Agreement) shall be free of any Member lien, interest or encumbrance, and title
                      to all real properties and all leases subject to the Loan Agreement and any security
                      interest held in such properties by Member shall be transferred to Buyer (or its
                      designee). Notwithstanding the foregoing, upon financing the Debt Purchase,
                      Member shall have the right to secure its loan to the Buyer by recording deeds of
                      trust or other collateral instruments against the real properties or other security as
                      mutually agreed. In addition, the lease agreements for any real estate owned or
                      controlled by Member which is leased by any Company shall be amended to
                      reflect market terms and rates.

7.   Break Up Fee:    If, through no fault of Buyer, the Proposed Acquisition does not close, Member
                      agrees to pay to PHI as liquidated damages the amount of $2,000,000 cash

within five (5) days of such failure to close; provided, if Ginsberg is successful in purchasing the membership interest of Member, this provision shall not apply.

8.    Tax Indemnities:   If it is determined that Member has incurred a federal income tax liability directly related to the business of the Companies during the time period of January 1, 2016 until Closing, as a result of Companies' status as flow-through entities (including but not limited to any finding by the IRS that the Companies have not paid the correct amount of income tax resulting from disallowed deductions under IRC 280e, and including penalties and interest from same), then the Buyer will make a payment to or on behalf of the Member as and when any such determination is made, up to a maximum of $40,000,000, and provided that Member takes such action as the Buyer reasonably requests to mitigate such tax and provided further that Buyer's payment obligation shall be reduced by the amount of any distributions Member may have received or become entitled to during such time period.

9.    Representations,   Each party to the definitive agreements would make, and the definitive agreement
Warranties, and   would reflect, such representations, warranties and covenants as are typical for a
Covenants; Closing   transaction of this nature involving the acquisition of a company of this size and
Conditions:   complexity and reflecting the provisions set forth herein. The transaction would be subject to such closing conditions as established by Buyer, including but not limited to the Conditions Precedent set forth in section 3 above.

The parties agree to cooperate fully and act in good faith to ensure that (a) all Necessary Regulatory Approvals are secured in a timely manner, and (b) the definitive agreements and their actions thereunder place the parties in the most tax-advantaged position reasonably commercially possible while preserving the basic business terms and conditions set forth herein.

10.    Key Employees:   Buyer would offer employment packages prior to the closing of the transaction to Ryan Brown and Jon Boord and any other Company employees determined by Buyer (each, a "Key Employee"). Additional Key Employees, if any, would receive compensation packages consistent with their seniority as determined by Buyer. The acceptance of all such offers shall be a closing condition.

10.    Non-competition:   Each Key Employee (and such other key employees as Buyer may identify during its due diligence) shall enter into non-competition agreements to not engage in the

business of the Company for the later of three years following the closing date or one year following termination of employment with Buyer.

## Schedule 1

### List of subsidiaries and affiliates

- NR PARENTCO, LLC, a Colorado limited liability company
- THE DANDELION, LLC, a Colorado limited liability company
- ALTERNATIVE MEDICINE ON THE MALL, LLC, a Colorado limited liability company
- BOULDER RX, LLC, a Colorado limited liability company
- RJJ FRISCO, LLC, a Colorado limited liability company
- 861 SUMMIT BOULEVARD, LLC, a Colorado limited liability company
- J&R PARTNERS, LLC, a Colorado limited liability company
- WINDSTREAM DENVER ON DAHLIA, LLC, a Colorado limited liability company
- RJJ SHERIDAN, LLC, a Colorado limited liability company
- RJJ LONGMONT, LLC, a Colorado limited liability company
- RJJ DILLON, LLC, a Colorado limited liability company
- RJJ MORRISON, LLC, a Colorado limited liability company
- RJJ EDGEWATER, LLC, a Colorado limited liability company
- 850 LITTLE BEAVER TRAIL, LLC, a Colorado limited liability company
- 5610 W 20th Ave., LLC, a Colorado limited liability company
- 3680 MORRISON ROAD, LLC, a Colorado limited liability company
- RJJ ASPEN, LLC, a Colorado limited liability company
- RJJ SANTA FE, LLC, a Colorado limited liability company
- RJJ WASHINGTON, LLC, a Colorado limited liability company
- RJJ UNIVERSITY. LLC, a Colorado limited liability company
- RJJ TOWER, LLC, a Colorado limited liability company
- RJJ ACADEMY. LLC, a Colorado limited liability company
- RJJ UINTAH. LLC, a Colorado limited liability company
- RJJ COLORADO SPRINGS, LLC, a Colorado limited liability company
- RJJ PUEBLO, LLC, a Colorado limited liability company
- RJJ TEJON, LLC, a Colorado limited liability company
- 7870 W QUINCY, LLC, a Colorado limited liability company
- 3150 S SHERIDAN, LLC, a Colorado limited liability company
- 7050 TOWER, LLC, a Colorado limited liability company
- 1003 ACADEMY, LLC, a Colorado limited liability company
- 1705 UINTAH, LLC, a Colorado limited liability company
- 3880 AUSTIN BLUFFS, LLC, a Colorado limited liability company
- 2100 53RD, LLC, a Colorado limited liability company
- 1433 TEJON, LLC, a Colorado limited liability company
- 1905 DIVISION LLC, a Colorado limited liability company
- CONSCIOUS CONFECTIONS LLC, a Colorado limited liability company
- CONSCIOUS CONFECTIONS II LLC, a Colorado limited liability company
- RJJ 285 LLC, a Colorado limited liability company
- RJJ ADAMS LLC, a Colorado limited liability company
- RJJ HIGHLANDS LLC, a Colorado limited liability company
- RJJ MEL RAY LLC, a Colorado limited liability company
- RJJ TRINIDAD LLC, a Colorado limited liability company
- 680 LIPAN LLC, a Colorado limited liability company
- 4990 DAHLIA LLC, a Colorado limited liability company

3140 SANTA FE TRAIL LLC, a Colorado limited liability company

The list of companies shall include all entities that have any interest in any "Real Properties" as defined in the First Amended and Restated Loan Agreement dated as of April 18, 2016 between the foregoing entities and BRIGHTSTAR, LLC.