1
2
3
4
5
6
7

Hon. Ricardo S. Martinez

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10
11

LEFT COAST VENTURES, INC., a
Delaware corporation,

No. 2:19-cv-00686-RSM

12

Plaintiff,

13

v.

14
15

BRIGHTSTAR, LLC, a limited liability
company organized under the laws of
Colorado,

16

Defendant.

LEFT COAST VENTURES'
RESPONSE TO MOTION TO
DISMISS FIRST AMENDED
COMPLAINT

**Noted on Motion Calendar:**
July 5, 2019

ORAL ARGUMENT REQUESTED

17

18

## I.      INTRODUCTION

19

While Defendant Brightstar, LLC ("Brightstar") insists this case "is . . . about letters

20

of intent," Motion at 1, Brightstar ignores that it made "a binding commitment . . . to sell

21

and transfer to [Left Coast] . . . [Brightstar's] membership interests" in the Native Roots

22

Entities.  Contract at 1.  That "binding commitment" was "subject to [Left Coast's

23

predecessor's] due diligence investigation of" the Native Roots Entities.  *Id.*  Accordingly,

24

Brightstar granted Left Coast's predecessor an option to buy the Native Roots Entities.

25

Brightstar's focus on the title of the Contract does not change the fact that it contracted to

26

LEFT COAST VENTURES' RESPONSE TO MOTION
TO DISMISS FIRST AMENDED COMPLAINT
No. 2:19-cv-00686-RSM – Page 1

Arête
LAW GROUP

1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

1   sell the Native Roots Entities and that the material terms of that commitment were defined.

2   Brightstar's Motion to Dismiss must be denied.

3                                    **II.    FACTS**

4          Native Roots is a chain of medical and recreational marijuana dispensaries in

5   Colorado.  First Amended Complaint ("FAC") ¶ 9.  Those dispensaries are owned by three

6   Colorado limited liability companies.  *Id.* ¶¶ 9-10.  Those limited liability companies are

7   governed by three substantially similar operating agreements, each of which contains a

8   buyout provision (the "Shotgun Clause") by which a member could offer to buy another

9   member's interests in the companies at a set price.  *Id.* ¶ 11.  The member receiving the

10  offer would be required to sell its entire membership interest at the offering price or buy the

11  entire membership interest of the offering party at the offering price, adjusted for the

12  percentage difference in the membership interests of the offering and receiving members.

13  *Id.*

14         In the summer of 2017, Brightstar offered to buy the membership interests in the

15  Native Roots Entities of Josh Ginsberg, one Brightstar's partners in those companies.  *Id.*

16  ¶ 12.  Although by Brightstar's own admission it was a lowball offer, Ginsberg lacked the

17  financial resources to "call" Brightstar's offer, and therefore approached Privateer Holdings

18  to explore whether it might be interested in assisting Ginsberg in purchasing Brightstar's

19  interests in the Native Roots Entities.  *Id*. ¶ 13.

20         While evaluating the possibility of assisting Ginsberg in purchasing Brightstar's

21  interests in the Native Roots Entities, Privateer Holdings met in person and telephonically

22  on multiple occasions with Peter Knobel, Brightstar's principal.  *Id.* ¶ 16.  In late August of

23  2017, Knobel told Privateer that it could buy Native Roots after Brightstar's shotgun offer

24  to Ginsberg closed.  *Id.* ¶ 17.  But Knobel expressed concern that if Ginsberg were able to

25  meet the terms of Brightstar's shotgun offer, he would have been outmaneuvered resulting

26  in a far smaller return than he had anticipated.  *Id.*

LEFT COAST VENTURES' RESPONSE TO MOTION
TO DISMISS FIRST AMENDED COMPLAINT
No. 2:19-cv-00686-RSM – Page 2

Arête
LAW GROUP

1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

Days later, Brightstar and Privateer Holdings entered into a contract (the "Contract") regarding Privateer Holdings' (or its designee's) acquisition of "all the membership interests of NR Parentco, LLC, the Dandelion, LLC, Boulder RX, LLC, and all of their respective subsidiaries and affiliates," *i.e.*, the Native Roots Entities. *Id.* ¶ 18 & Ex. A. Brightstar and its counsel participated in drafting the Contract, including specific changes to the Contract that were accepted prior to its execution. *Id.* ¶ 19.

In the Contract, Brightstar committed to sell the Native Roots Entities to Privateer Holdings or its designee, subject to Privateer Holdings' completion of due diligence:

> This LOI represent[s] a binding commitment by Member [Brightstar] to undertake the obligations set forth herein, including without limitation the obligation to sell and transfer to Buyer (i) the membership interest of the Companies, and (ii) the real property, leases, and debt under the First Amended and Restated Loan Agreement dated April 18, 2019 (the "Loan Agreement"), all subject to Buyer's completion of its due diligence investigation of the Companies and the Member's and Ginsberg's membership interests in the Companies, as well as any other entities and subject matters, to its satisfaction.

FAC Ex. A at 1.

Though the Contract contained contingencies, all of those contingencies favored Privateer Holdings and did not alter Brightstar's unconditional obligation to sell all of the membership interests of the Native Roots Entities. *Id.* ¶ 19.

Sometime after the Contract was executed, Ginsberg initiated an arbitration against Brightstar and the Native Roots Entities. *Id.* ¶ 21. The sale was not completed during that arbitration. *Id.* Throughout the duration of the arbitration, Knobel provided Privateer Holdings updates on the arbitration and repeatedly expressed his intention to complete the sale as required under the Contract. *Id.* ¶¶ 22-23. After the arbitration settled in September of 2018, the members of the Native Roots Entities engaged an investment banker to assist with selling the Native Roots Entities. *Id.* ¶ 24. It began to become apparent to Privateer Holdings that Brightstar might not uphold its bargain under the Contract. Privateer

LEFT COAST VENTURES' RESPONSE TO MOTION
TO DISMISS FIRST AMENDED COMPLAINT
No. 2:19-cv-00686-RSM – Page 3

Arête
LAW GROUP

1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

Holdings reserved its rights under the Contract, but discussed potential terms of a superseding contract. *Id.* ¶ 27.

On January 31, 2019, Privateer Holdings assigned its rights under the Contract to Left Coast. *Id.* ¶ 28. On February 21, 2019, Brightstar's counsel informed Privateer Holdings' counsel that Brightstar would not uphold the deal in the Contract, would not enter a superseding Contract, and that the Native Roots entities were being shopped for sale to a third party. *Id.* ¶ 30.

### III.    ARGUMENT

**A.    Fed. R. Civ. P. 12(b)(6) Standard**

The Court may dismiss a complaint that "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 678.

**B.    Left Coast Has Stated Claims for Breach of Contract and Declaratory Judgment**

**1.    The Contract is not an "Agreement to Agree"**

Brightstar argues that the Contract is merely an "agreement to agree." Motion at 4-6. In support of its contention that the Contract is an unenforceable "agreement to agree," Brightstar cites two cases for this uncontroversial proposition of law: *Johnson v. Star Iron & Steel Co.*, 9 Wn. App. 202, 511 P.2d 1370 (1973), and *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 94 P.3d 945 (2004). Neither apply here.

In *Johnson*, the plaintiff attempted to enforce an alleged contract that was not accepted by the defendant, but rather countered with material changes from the offer. The plaintiff had sent a letter setting certain proposed terms of a transaction. *Johnson*, 9 Wn. App. at 203-04. The defendant responded to the plaintiff, accepting certain terms of the

---

LEFT COAST VENTURES' RESPONSE TO MOTION
TO DISMISS FIRST AMENDED COMPLAINT
No. 2:19-cv-00686-RSM – Page 4

Arête
LAW GROUP

1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

offer, but making two material changes: (1) specifying the source of financing, and (2) striking an option to purchase one of the defendant's subsidiaries and instead proposing that option "be the subject of further discussion and a separate agreement." *Id.* at 204-06. The court of appeals found the alleged contract to be unenforceable as "[i]t is axiomatic that an expression of assent that changes the terms of an offer in any material respect may operate as a counter-offer, but is not an acceptance." *Id.* at 205. Brightstar did not submit a counteroffer to Privateer Holdings, but rather agreed to all terms in the Contract.[1] *See* Contract at 3 (Knobel executing Contract on Brightstar's behalf as "[a]ccepted and agreed to as of August 25, 2017"). Because there was no un-accepted counteroffer to Privateer Holdings' offer, *Johnson* has no application here.

Similarly, *Keystone Land* does Brightstar little good. In *Keystone Land* the Ninth Circuit Court of Appeals asked two certified questions of the Washington Supreme Court, only the first of which is conceivably relevant to this matter:

> Will Washington contract law recognize and enforce an agreement, whether implicit or explicit, between two or more parties to negotiate a future contract under the circumstances presented in this case?

*Keystone Land*, 152 Wn.2d at 173-74. The Washington Supreme Court declined to answer the general question—whether a contract to negotiate is enforceable—because of the particular circumstances in that case. *Id.* at 179. The Washington Supreme Court held that in that case, no contract to negotiate was formed because there was no "offer and acceptance to be bound to specific standards of negotiating conduct for the formation of a separate substantive contract." *Id.* at 178. The court also considered the plaintiff's alternative argument that because the defendant indicated that it was "prepared to negotiate a Purchase and Sale Agreement" with the plaintiff, it unconditionally committed to sell the facility that was to be the subject of the contract to be negotiated. The Washington

---

[1] Prior to accepting the terms of the Contract, Brightstar suggested changes to the terms proposed by Privateer Holdings, which were accepted in the Contract executed by both parties. FAC ¶ 18.



1    Supreme Court rejected that argument as well, finding that "[a]t most, the statement is a

2    manifestation of [defendant's] intention to negotiate with [plaintiff]." *Id.* at 179.

3         In short, *Johnson* and *Keystone Land* stand for the uncontroversial proposition that

4    an "agreement to agree" is not an enforceable contract.  Those cases add nothing to the

5    Court's analysis here.

6         **2.    Brightstar's Reliance upon *Casad* Violates Court Rules and is Misplaced**

7         Brightstar's argument that the Contract is not enforceable is based primarily upon

8    *Casad v. Huff*, No. 32692-2-II, 2005 WL 3541569, at *4 (Wash. Ct. App. 2005).  Before

9    turning to the substance of *Casad*, Left Coast notes that by the plain terms of that opinion,

10   Washington State Court Rules, and authority from this Court, *Casad* should not be

11   considered.

12        *Casad* is an unpublished 2005 opinion from Division 2 of the Washington Court of

13   Appeals.  Under Washington General Rule 14.1, an unpublished opinion of the Court of

14   Appeals can be cited only if it was filed on or after March 1, 2013 and, even then, it can be

15   cited only for persuasive value and must be identified by the citing party as unpublished.

16   "While GR 14.1 is not binding in federal court, the Court nevertheless follows GR 14.1 as a

17   matter of comity."  *Hanson v. MGM Resorts Int'l*, No. C16-1661-RAJ, 2017 WL 3085694,

18   at *3 n.1 (W.D. Wash., July 20, 2017).  "Because Washington courts have made the

19   judgment that 'unpublished' state court decisions should not shape their decisions, this

20   court follows their lead."  *Cont'l W. Ins. Co. v. Costco Wholesale Corp.*, No. C10-1987

21   RAJ, 2011 WL 3583226, at *4 (W.D. Wash., Aug. 15, 2011).

22        Setting aside Brightstar's failure to identify *Casad* as unpublished, because it was

23   filed before March 1, 2013, it cannot be considered by this Court, even if only for

24   persuasive value.  *Hanson*, 2017 WL 3085694, at *3 n.1; *Continental Western Insurance*,

25   2011 WL 3583226, at *4.  But even if this Court ignores that rule, *Casad* does little to help

26   Brightstar here.

Arête
LAW GROUP

1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

In *Casad*, an inventor, his long-time friend, and Casad held a series of meetings to discuss the possibility of developing and marketing a non-destructive joint sealant testing device and to create a company to hold the intellectual property for that invention (and receive profits from its exploitation). *Casad*, 2005 WL 3541569, at *1-*2. The letter the three potential business partners signed explicitly stated that it was "written to outline discussions and *tentative* agreements to date regarding a potential new business." *Id.* at *1 (emphasis added). The letter went on provide that the "*tentative* agreements are as follows," then listed several paragraphs, including the following (Paragraph 12 of the alleged contract):

> Exact company structure and subsequent agreements are not yet determined, and needs to be done quickly, since [plaintiff] is investing substantial sums of money in this venture ($10,000 to $20,000) during the months of May-June 2001.

*Id.* at *2 (emphasis added).

The trial court found that to enforce the alleged contract it had to sever Paragraph 12 because it was an "agreement to an agreement." *Id.* Yet despite severing that "unenforceable agreement to later agree," the trial court directed that the inventor transfer the intellectual property in the invention to a company that Casad had formed and ordered that each of the parties (two defendants and one plaintiff) would hold a one-third share of that company. *Id.* at *3.

The appellate court found that the contract failed because "paragraph 12 of the letter of intent was inseparable from the remainder of the offer." *Id.* at *5. Because "it spoke directly to the subject matter of the letter—the business to be formed . . . it cannot be said that a person reasonably could find that the parties intended paragraph 12 to be collateral and unrelated to the remainder of their agreement." *Id.* The trial court therefore erred in severing this "agreement to agree" on one of the most critical aspects of the deal from the remainder of the contract. *Id.* In finding the alleged contract to be invalid for lack of mutual assent, the *Casad* Court emphasized that nowhere in the alleged contract did the

LEFT COAST VENTURES' RESPONSE TO MOTION
TO DISMISS FIRST AMENDED COMPLAINT
No. 2:19-cv-00686-RSM – Page 7

Arête
LAW GROUP

1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

parties definitively agree: "[L]anguage in the letter referencing 'tentative agreements' for a 'potential new business' emphasizes the provisional nature of the parties' agreement." *Id.* at \*7.  Similarly, "[p]aragraph 12 reaffirmed the tentative nature of the parties' agreements." *Id.* at \*5.  The alleged contract in *Casad*, which was definitive on nothing, stands in stark contrast to the binding contract here, as explained in greater detail in Section III.B.3, *infra*.

### 3. The Parties Contracted for Brightstar to Sell the Native Roots Entities to Privateer Holdings or its Assignee

Brightstar makes much of the fact that the Contract contemplated a future "definitive agreement."  *See, e.g.*, Motion at 1.  But Washington law has long recognized that parties can "enter a binding contract even if the parties contemplate a more formal future document."  *Keystone Land & Dev. Co. v. Xerox Corp.*, 353 F.3d 1070, 1073 (9th Cir. 2003) (citing *Loewi v. Long*, 76 Wash. 480, 484, 136 P. 673 (1913); *Fuller v. Ostruske*, 48 Wn.2d 802, 807, 296 P.2d 996 (1956)).  "The party asserting the existence of the contract must prove that the terms of the contract are stated, agreed upon, and that the parties intended the terms to be a binding agreement before signing the formal document." *Id.* (citing *Loewi*, 76 Wash. at 484).

Under Washington law, the goal of contract interpretation is to determine the intent of the parties.  *Deep Water Brewing, LLC v. Fairway Resources Ltd.*, 152 Wn. App. 229, 248, 215 P.3d 990 (2009).  To do so, courts follow the "objective manifestation theory of contracts" by determining the intent of the parties from the reasonable meaning of the words in the contract.  *GMAC v. Everett Chevrolet, Inc.*, 179 Wn. App. 126, 134-35, 317 P.3d 1074 (2014).  "An interpretation which gives effect to all of the words in a contract provision is favored over one which renders some of the language meaningless or ineffective."  *Seattle-First Nat. Bank v. Westlake Park Assocs.*, 42 Wn. App. 269, 274, 711 P.2d 361 (1985); *see also Grey v. Leach*, 158 Wn. App. 837, 850, 244 P.3d 970 (2010) (same).  Contracts are considered as a whole, interpreting particular language in the context

Arête LAW GROUP   1218 THIRD AVENUE SUITE 2100 SEATTLE WA 98101 (206) 428-3250

of other contract provisions. *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 669-70, 155 P.3d 115 (2000).

Contract formation requires an objective manifestation of assent of both parties. *Keystone Land*, 152 Wn.2d at 177. "[T]he terms assented to must be sufficiently definite." *Id.* at 178. "Normally, the existence of mutual assent or a meeting of the minds is a question of fact." *Sea-Van Invest. Assoc's v. Hamilton*, 125 Wn.2d 120, 126, 881 P.2d 1035 (1994).

The Contract here plainly shows objective manifestation of both Privateer Holdings' and Brightstar's assent to Brightstar's binding commitment to sell the Native Roots Entities to Privateer Holdings or its designee:

> This LOI represent[s] a **binding commitment** by Member [Brightstar] to undertake the obligations set forth here, including **without limitation the obligation to sell and transfer to Buyer (i) the membership interests of the Companies, and (ii) the real property, leases, and debt under the First Amended and Restated Loan Agreement dated April 18, 2016** (the "Loan Agreement"), all subject to Buyer's completion of its due diligence investigation of the Companies and the Member's and Ginsberg's membership interests in the Companies, as well as any other entities and subject matters, to its satisfaction.

Contract at 1 (emphases added). This provision granted Privateer Holdings (or its designee) an option to purchase the Native Roots Entities on the terms described elsewhere in the Contract.[2]

Brightstar insists that this "binding commitment . . . to sell and transfer . . . the Companies" means nothing because elsewhere in the Contract words and phrases such as "possible acquisition" and "proposed terms" are used. But those words and phrases were used because the Contract granted Privateer Holdings (or its designee) an *option* to complete the purchase subject to its due diligence. The terms of the deal, all of which are

---

[2] Brightstar argues that Privateer Holdings' and Brightstar's repeated mutual expression of "intent to close the deal" is evidence that the Contract is not binding. *See* Motion at 6; FAC ¶¶ 22-23. It is no such thing, as Privateer Holdings/its designee held an *option* to purchase. Even if that were not the case, mutual expression of intent to close a deal would not undermine the validity of a contract to later close a deal. Enforceable contracts frequently call for "closing" at a date after execution of the contract.

LEFT COAST VENTURES' RESPONSE TO MOTION
TO DISMISS FIRST AMENDED COMPLAINT
No. 2:19-cv-00686-RSM – Page 9

Arête
LAW GROUP

1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

set forth in Exhibit A to the Contract, were "proposed" because they would not become final until Privateer Holdings or its designee exercised the option.[3]  Interpreting this allegedly conditional language to mean that the Parties had not agreed upon the deal requires ignoring the Contract's provision that it is a "binding commitment . . . to sell and transfer . . . the Companies," which would render that language ineffective.  Contract at 1. Because a court should not interpret a contract such that language in the contract become "meaningless or ineffective," Left Coast's interpretation is favored.  *Seattle-First*, 42 Wn. App. at 274; *Grey*, 158 Wn. App. at 850.  Indeed, Left Coast's interpretation is the only one that does give effect to all language in the Contract.

### 4.   At Best for Brightstar, the Contract is Ambiguous, Which Would Present an Issue of Fact that Cannot be Resolved on a Fed. R. Civ. P. 12(b)(6) Motion

For the reasons set forth above, Brightstar contracted to sell the Native Roots Entities to Privateer Holdings or its designee.  *See* Section III.B.3, *supra*.  But if the Court gives any credit to Brightstar's argument that the conditional language (which exists because Privateer Holdings had the option to purchase the Native Roots Entities) conflicts with Brightstar's "binding commitment . . . to sell and transfer . . . the Companies," the Contract is ambiguous, rendering its meaning to be a question of fact.

"If a contract provision's meaning is uncertain or is subject to two or more interpretations, the provision is ambiguous." *Factory Sales and Eng'g, Inc. v. Nippon Paper Indus. USA Co., Ltd.*, No. 3:14-cv-05899, 2015 WL 4094447, at *3 (W.D. Wash., July 7, 2015) (citing *Am. Nat. Fire Ins. Co. v. B & L Trucking & Const. Co.*, 134 Wn.2d 413, 428, 951 P.2d 250 (1998)).

If the Court finds that, as a matter of law, it cannot harmonize Brightstar's binding obligation to sell the Native Roots entities with the allegedly conditional terms to which

---

[3] Brightstar does not argue, because it cannot, that but for the conditional language in the Contract, the terms of the deal set forth in Exhibit A to the Contract are not sufficiently definitive.  Exhibit A to the Contract sets forth all of the essential terms of Privateer Holdings' acquisition of the Native Roots Entities.

Arête
LAW GROUP

1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

Brightstar points, that "binding commitment" would conflict with the allegedly conditional terms, rendering the Contract ambiguous. *Factory Sales* is illustrative.  In that case, a project owner brought a Fed. R. Civ. P. 12(b)(6) motion to dismiss a subcontractor's claim against it on the grounds that the subcontractor was not a third-party beneficiary to a contract.  The contract provided both (1) that it "shall not be construed to create any contractual relationship" between the project owner and a subcontractor or otherwise create any obligation by the owner to a subcontractor, and also (2) that the project owner would obtain insurance for which a subcontractor would be an insured and that the project owner waived rights against subcontractors for loss of use. *Factory Sales*, 2015 WL 4094447, at *4.  These terms plainly conflicted. *Id.*  The *Factory Sales* Court observed that the conflict could be resolved by either favoring the specific provisions over the general or by giving effect to the general provision that subcontractors would have no rights under the contract. *Id.*  Finding both interpretations reasonable but conflicting, the *Factory Sales* Court found the contract to be ambiguous, which therefore required the court to "consider extrinsic evidence to ascertain the parties' intent." *Id.*

Contractual "ambiguity presents a question of fact that cannot be determined as a legal matter." *Smokey Point Commercial, LLC v. Dick's Sporting Goods, Inc.*, No. 17-1015JLR, 2017 WL 4882664, at *4 (citing *GMAC*, 179 Wn. App. at 135).  "Because questions of fact cannot be resolved at the motion to dismiss stage, **a contract that presents an ambiguity cannot be dismissed on a Rule 12(b)(6) motion.**" *Id.* (citing *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 245 (9th Cir. 1990)) (emphasis added); *see also ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1009 (9th Cir. 2014) (If a contract "is ambiguous, then interpretation of the agreement presents a fact issue that cannot be resolved on a motion to dismiss.").[4]

---

[4] Ambiguity in the Contract terms would preclude dismissal on a Rule 12(b)(6) motion.  But even after the pleading stage, should the Contract's terms be found ambiguous, the ambiguous terms will not be construed

LEFT COAST VENTURES' RESPONSE TO MOTION
TO DISMISS FIRST AMENDED COMPLAINT
No. 2:19-cv-00686-RSM – Page 11

Arête
LAW GROUP

1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

1    If the Court finds that the allegedly conditional language in the Contract conflicts

2  with Brightstar's "binding commitment . . . to sell and transfer . . . the Companies," then

3  the Contract is ambiguous and extrinsic evidence will be required to resolve the factual

4  dispute as to the parties' intention. *Factory Sales*, 2015 WL 4094447, at *4 (denying

5  motion to dismiss and observing that "Nippon's motion comes early in the proceedings as a

6  Fed. R. Civ. P. 12(b)(6) motion—without the completion of discovery—so the Court has

7  only considered the pleadings and the Contract.  Extrinsic evidence may yet shed light on

8  the Contract's proper interpretation."); *Smokey Point Commercial*, 2017 WL 4882664, at

9  *7.  Because such factual disputes cannot be resolved on a Fed. R. Civ. P. 12(b)(6) motion,

10  Brightstar's motion to dismiss must be denied.  *Smokey Point Commercial*, 2017 WL

11  4882664, at *4; *ASARCO*, 765 F.3d at 1009.

12  **C.    The Exclusivity Clause did not Terminate the Contract**

13    Brightstar contends that the Contract's obligations expired on December 31, 2017.

14  *See* Motion at 8.  Brightstar's argument is based upon a clause of the Contract titled

15  "Exclusivity."  *See* Contract at 2.  That clause provides in relevant part:

16    Exclusivity.  Until 5:00 p.m. Pacific Time on December 31, 2017 (the
   "Termination Date"), neither the Buyer nor the Member shall (and each
17    shall not permit its affiliates, financial advisors, attorneys, accountants or
   other representatives to), directly or indirectly, (a) accept any existing
18    proposal or offer outstanding as of the date of this LOI or received on or
   after the date of this LOI from any other party to consummate a
19    Competing Transaction; or (b) solicit, initiate, approve, facilitate or
   encourage, engage in discussions or negotiations with, or furnish
20    information to, any person other than Buyer with respect to a Competing
   Transaction. . . .
21
   *Id.*
22
23    Contrary to Brightstar's assertion, the "Termination Date" referenced in the

24  Exclusivity Clause is not a date for terminating the Contract; rather, it is a date for

25  terminating the Exclusivity Clause.  Had the parties wished to terminate the Contract on

26  against Left Coast, as both Privateer Holdings and Brightstar participated in drafting the Contract.  FAC ¶ 18;
   *Viking Bank v. Firgrove Commons, LLC*, 183 Wn. App. 706, 713, 334 P.3d 116 (2014).

Arête LAW GROUP

1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

that date (or any other), they easily could have included such a provision. But this clause only provides that up until 5pm on December 31, 2017, the parties to the Contract were not permitted to engage in negotiations or accept any proposal for a "Competing Transaction."[5] *Id.*

Brightstar contends that, despite plain language limiting the "Termination Date" to termination of the Exclusivity Clause, any reading of that clause other than terminating the entire agreement "would lead to an absurd result." Not so. As stated on the first page of the Contract, the Contract granted Privateer Holdings (or its assignee) the right to purchase the Native Roots Entities subject to Privateer Holdings' due diligence. However, Privateer Holdings was not required to complete the purchase. It was an option. Indeed, the Exclusivity Clause barred not only Brightstar from soliciting or negotiating a competing transaction, but also barred Privateer Holdings from soliciting, negotiating, or accepting a competing transaction. The Exclusivity Clause therefore barred Privateer Holdings from going back to Brightstar's co-member of the Native Roots Entities, Josh Ginsberg, and negotiating a more favorable deal with him during the pendency of the exclusivity term. Brightstar likely was concerned about such an action, as Ginsberg initially approached Privateer Holdings about partnering with him to "call" Brightstar's shotgun offer and buy out Brightstar's interests in the Native Roots Entities. *See* FAC ¶ 14.

---

[5] A "competing transaction" is, essentially, any other transaction relating to acquisition of the Native Roots Entities:

> A Competing Transaction means, other than the Proposed Acquisition, (i) any transfer or sale of the Member's membership interests in the Companies (or rights to acquire Ginsberg's interests), (ii) any merger, consolidation, share exchange, recapitalization, or establishment or investment in another legal entity or other similar transaction involving any of the Companies, (iii) any sale, lease, exchange, mortgage, pledge, transfer, or other disposition of a material portion of the assets of the Member or the Companies, or (iv) any issuance, sale or transfer of equity interest or debt (or rights to acquire equity interests or debt) of the Companies (including for raising capital purposes) (in each case, a "Competing Transaction").

Contract at 2.

LEFT COAST VENTURES' RESPONSE TO MOTION
TO DISMISS FIRST AMENDED COMPLAINT
No. 2:19-cv-00686-RSM – Page 13

Arête
LAW GROUP

1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

The "Termination Date" of the Exclusivity Clause terminated only that clause, not the entire Contract. That the December 31, 2017 Exclusivity Clause "Termination Date" passed without the deal closing did not terminate the Contract.[6]

**D.     The Liquidated Damages Clause Does not Bar Left Coast's Specific Performance Remedy**

Brightstar contends that "[l]iquidated damages clauses . . . preclude a party's right to seek specific performance 'where the contract indicates that to be the result which both parties had in mind.'" Motion at 8 (citing *Asia Inv. Co. v. Levin*, 118 Wash. 620, 624, 204 P. 808, 810 (1922)). That Brightstar relies upon nearly century old authority for this proposition is revealing. Even more revealing, although the contract at issue in *Asia Investment Company* contained a liquidated damages clause, the Washington Supreme Court observed that "[u]nless it is clear that it was the intention that the parties definitively decided to limit their rights, the courts will not interpret language to have that effect." *Asia Inv. Co.*, 118 Wash. at 628. Because it was not clear that the parties intended the liquidated damages clause to bar a claim for specific performance, the "right to resort to an action for specific performance" was preserved. *Id.*; *see also Washington Cranberry Growers' Assn'n v. Moore*, 117 Wash. 430, 442, 204 P. 811 (1922) (Mackintosh, J., dissenting) (recognizing that post-*Asia Investment Company*, "although the contract agrees upon liquidated damages, still, upon a breach by one party, the other party has the option for suing for the recovery of such damages, or in equity to enforce specific performance").

Here, the parties did not clearly express their intent by, for example, stating that Privateer Holdings (or its assignee) would be limited to liquidated damages for Brightstar's breach. Accordingly, Left Coast may pursue specific performance as a remedy for Brightstar's breach of the Contract.

---

[6] The deal did not close in this time period likely because Ginsberg had initiated an arbitration against Brightstar and the Native Roots Entities shortly after the Contract was formed. *See* FAC ¶ 21. But this is immaterial to Left Coast's claim as it had an option to purchase the Native Roots Entities and waited for that arbitration to resolve before attempting to exercise that option.

LEFT COAST VENTURES' RESPONSE TO MOTION
TO DISMISS FIRST AMENDED COMPLAINT
No. 2:19-cv-00686-RSM – Page 14



1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

1

### IV.     CONCLUSION

2       Brightstar entered "a binding commitment" to sell the Native Roots Entities to

3  Privateer Holdings or its designee.  Contract at 1.  That Brightstar has since developed

4  seller's remorse does not relieve it of that obligation.  Left Coast has stated facially

5  plausible claims for declaratory judgment and breach of contract.  At the very best for

6  Brightstar, the Contract may contain ambiguities, which cannot be resolved on a Fed. R.

7  Civ. P. 12(b)(6) motion.  Expiration of the Exclusivity Clause did not terminate the

8  Contract and the parties did not limit their remedies to liquidated damages.  For all of the

9  foregoing reasons, Brightstar's Motion to Dismiss should be denied.

10

11  DATED:  July 1, 2019.

12                                              **ARETE LAW GROUP PLLC**

13                                              By:  */s/ Jeremy Roller*
                                                Jeremy E. Roller, WSBA No. 32021
14                                              1218 Third Avenue, Suite 2100
                                                Seattle, WA 98101
15                                              Phone:  (206) 428-3250
                                                Fax:  (206) 428-3251
16                                              jroller@aretelaw.com

17                                              *Attorneys for Left Coast Ventures, Inc.*

18

19

20

21

22

23

24

25

26

LEFT COAST VENTURES' RESPONSE TO MOTION
TO DISMISS FIRST AMENDED COMPLAINT
No. 2:19-cv-00686-RSM – Page 15

Arête
LAW GROUP

1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250

1

**CERTIFICATE OF SERVICE**

2      I, Jeremy Roller, hereby certify that on July 1, 2019, I electronically filed the

3  forgoing document with the Clerk of the Court using the CM/ECF system which will send a

4  notification of filing to the follow parties:

5
       Parker C. Folse III, WSBA #24895
6      SUSMAN GODFREY L.L.P.
       1201 Third Avenue, Suite 3800
7      Seattle, WA 98101
       Phone: (206) 516-3880
8      pfolse@susmangodfrey.com

9
       Christopher O. Murray, WSBA #36851
10     BROWNSTEIN HYATT FARBER SCHRECK, LLP
       410 Seventeenth Street, Suite 2200
11     Denver, CO 80202
       Phone: (3030) 223-1100
12     cmurray@bhfs.com

13
       *Attorneys for Defendant Brightstar, LLC*
14
   DATED this 1st day of July, 2019 at Seattle Washington.
15

16                               **ARETE LAW GROUP**

17                               */s/ Jeremy Roller*
                                 Jeremy E. Roller
18

19

20

21

22

23

24

25

26

LEFT COAST VENTURES' RESPONSE TO MOTION
TO DISMISS FIRST AMENDED COMPLAINT
No. 2:19-cv-00686-RSM – Page 16

Arête
LAW GROUP

1218 THIRD AVENUE
SUITE 2100
SEATTLE WA 98101
(206) 428-3250